IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GRANT HEILMAN PHOTOGRAPHY, INC. | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| | : | |
| PEARSON EDUCATION, INC., et al. | : | NO. 11-cv-4649 |
| Defendants. | : | |

<u>MEMORANDUM ORDER</u>

AND NOW, this 30th day of April, 2012, upon consideration of Defendant Pearson Education's Motion for Protective Order (Doc. No. 18), Plaintiff's Response in Opposition Thereto (Doc. No. 19), Pearson's Motion for Leave to File a Reply Brief (Doc. No. 20), and the associated Reply Brief (Doc. No. 20-1), it is hereby ORDERED as follows:

1. Defendant Pearson Education's Motion for Leave to File a Reply Brief (Doc. No. 20) is GRANTED, and the associated Reply Brief (Doc. No. 20-1) has been considered.

2. Defendant Pearson Education's Motion for Protective Order (Doc. No. 18) is GRANTED as detailed below. Specifically, the Motion is GRANTED with respect to all three (3) categories of information at issue here: (1) Defendant's non-public financial information; (2) Defendant's non-public sales and marketing projections and forecasts; and (3) the print quantities and dates of Defendant's publications, including but not limited to the so-called "print quantity report" Defendant produced in this matter.

3. Accordingly, it is further ORDERED that documents containing Defendant's non-public financial data; sales and marketing projections and/or forecasts; and print quantities and dates, including the "print quantity report," shall be marked "CONFIDENTIAL," shall be used solely for the purpose of this litigation, and shall not be disclosed to any person except for the following individuals: (1) Attorneys actively working on this case and persons employed by or associated with them; (2) Witnesses and deponents of the disclosing party; (3) Judges, Magistrate Judges, law clerks and other personnel of this Court; (4) Court reporters recording or transcribing testimony; (5) Independent experts and persons employed by or associated with them who have been shown a copy of this

1

   Order and agree to be bound by it; (6) Parties in this action, including their employees or agents; and (7) Other persons agreed to in writing by and between counsel of record.

4.  A party may object to the designation of particular information as CONFIDENTIAL by giving written notice, identifying the information to which the objection is made, to the party designating the disputed information. All counsel shall then confer in good faith in an attempt to resolve the dispute within five (5) business days of receiving the aforementioned written notice. Only if the parties cannot resolve the dispute among themselves may they move for a Court ruling on the disputed issue. Any such motion must be made within five (5) days of the parties' conference or the disputed information shall lose its designation as CONFIDENTIAL. The party designating the information as CONFIDENTIAL shall bear the burden of establishing that good cause exists for the disputed information to be treated as CONFIDENTIAL.

I.  Factual Background and Procedural History

   Plaintiff Grant Heilman Photography, Inc. ("Plaintiff" or "GHPI") is a stock photography agency that licenses its photographs for distribution, including to Defendant Pearson Education ("Defendant" or "Pearson"), a publisher of educational textbooks. (Doc. No. 1 ¶¶ 5, 8, 12). Relevant to this suit, GHPI is the owner and exclusive copyright holder of over 2,500 photographs (the "Photographs") depicted in Exhibit A to the Complaint. (Doc. No. 1 ¶ 10). The Photographs have either been registered with the United States Copyright Office or are pending registration. (Doc. No. 1 ¶ 11, Ex. A).

   Between 1995 and 2010, GHPI sold Pearson limited licenses to use copies of the Photographs in Pearson's educational publications, but according to GHPI, Pearson's actual uses of the Photographs far exceeded the scope of the limited licenses. (Doc. No. 1 ¶¶ 12-14). GHPI has discovered at least seven (7) instances in which Pearson violated the terms of its license agreements, e.g., by printing more copies of the books containing GHPI's photographs than the licenses authorized. (Doc. No. 1 ¶¶ 14, 25). As one example, Pearson's license to use GHPI's Photographs in the 2001 *Developmental Reading Assessment* authorized up to 40,000 printed

copies, but Pearson printed at least 350,000 copies without giving notice to or asking permission from GHPI.  (Doc. No. 1 ¶ 14A).

GHPI's Complaint alleges that "[a]t the time Pearson represented to GHPI in its license requests that it needed specified, limited licenses to use the Photographs, Pearson knew its actual uses under the licenses would exceed the permission it was requesting and paying for."  (Doc. No. 1 ¶ 14).  Believing that Pearson may have surreptitiously violated the terms of its licensing agreements on a widespread basis, on July 1, 2011, GHPI asked Pearson to provide GHPI with information regarding Pearson's unauthorized uses of GHPI's Photographs, but Pearson refused.  (Doc. No. 1 ¶¶ 23-29).  GHPI then brought this suit, claiming that Pearson (1) infringed the copyrights to GHPI's Photographs and (2) committed fraud with respect to six of the particular transactions in which GHPI has discovered that Pearson exceeded the scope of its license agreements.

Pearson moved to dismiss GHPI's Complaint under Federal Rule of Civil Procedure 12(b)(6), and on October 12, 2011, we denied that motion in large part.  (See Doc. No. 12).  Now, the parties have apparently reached an impasse with respect to certain discovery-related issues.  Pearson filed the instant motion for an umbrella protective order pursuant to Federal Rule of Civil Procedure 26(c), seeking to keep confidential three (3) categories of information produced during discovery: (1) non-public financial information; (2) non-public sales and marketing projections and forecasts; and (3) most importantly (judging by the parties' briefing), the print quantities and dates of Pearson's publications, including the so-called "print quantity report" Pearson generated, and then turned-over to GHPI, in this action.

Now, some context.  These parties (or more precisely, their counsel) know each other

well. Similar "print overrun"-type copyright infringement actions have cropped-up all over the country, oftentimes involving the same parties and/or lawyers. Until recently, Plaintiff's counsel and Defendant's counsel had a history of cooperation on the issue of protective orders. Plaintiff's counsel has now reversed course and refuses to stipulate to the confidentiality of certain documents Pearson would like to keep out of the public domain, most notably a "print quantity report" that Pearson compiled in connection with this suit.

From what we can tell, the "print quantity report" contains a manual compilation of all of Pearson's print run information with respect to the images at issue in this matter. Pearson does not maintain such a report in the normal course of business; rather, Pearson produced this report to show that Pearson has not, in fact, overrun its publication license limits with respect to many of the photographs-in-suit. In doing so, Pearson hoped to save time and resources; streamline discovery; and facilitate resolution (settlement) of this case.

At the Rule 16 conference, counsel for both parties agreed to keep the report "Attorney's Eyes Only" pending the entry of a protective order. While Plaintiff's counsel may not have *explicitly* consented to a protective order covering the report during the conference, the entire tenor of the conversation led this Court to believe that entry of such an order was a foregone conclusion. In other words, the parties' attorneys would work it out, as they had done many times in the past. Consequently, Pearson no doubt believed that Plaintiff would agree to a stipulated protective order encompassing, among other things, the print quantity report. Unfortunately for Pearson, Plaintiff's counsel changed tactics, thereby precipitating Pearson's Rule 26(c) motion for a Court-issued protective order. For the reasons explained herein, we grant Defendant's motion as to Pearson's non-public financial information; sales and marketing

projections, and forecasts; and print quantities and dates, including the "print quantity report."

II.    Legal Analysis

Under Federal Rule of Civil Procedure 26(c), we "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). In fact, we have the inherent equitable power to grant such a confidentiality order, "whether or not such orders are specifically authorized by procedural rules." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785 (3d Cir. 1994) (citation omitted). As a general matter, the Third Circuit has approved of "umbrella" protective orders in complex cases, opining that such orders "will encourage efficiency and allow litigation to proceed more quickly" vis-a-vis a document-by-document approach to confidentiality. See Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121-23 (3d Cir. 1986) (citations omitted). This case, involving over 2,500 infringement claims spread across many publications, undoubtedly qualifies as "complex." Given the complexity of the case, we believe an umbrella protective order is warranted (so long as Pearson shows "good cause" for such an order, of course). See Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995) (declaring that party seeking protective order bears "the burden of establishing 'good cause' to protect the umbrella of confidentiality established by the confidentiality agreement.").

To determine whether "good cause" exists for the entry of a protective order, we may weigh factors such as "1) whether disclosure will violate any privacy interests; 2) whether the information is being sought for a legitimate purpose or for an improper purpose; 3) whether

disclosure of the information will cause a party embarrassment; 4) whether confidentiality is being sought over information important to public health and safety; 5) whether the sharing of information among litigants will promote fairness and efficiency; 6) whether a party benefitting from the order of confidentiality is a public entity or official; and 7) whether the case involves issues important to the public." Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005) (citations omitted). These factors "are neither mandatory nor exhaustive," but rather guideposts to help us appropriately balance "private versus public interests." Glenmede, 56 F.3d at 483. Of course, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." Arnold v. Pa. Dep't of Transp., 477 F.3d 105, 112-13 (3d Cir. 2007) (internal quotations and citation omitted). Instead, the injury resulting from disclosure must be "clearly defined and serious." Id. at 112. In addition, the Third Circuit has emphasized "the strong public interest in open proceedings." Glenmede, 56 F.3d at 484.

Against this legal backdrop, we now turn to the three categories of disputed information at issue here: (1) Pearson's non-public financial information; (2) Pearson's non-public sales and marketing projections and forecasts; and (3) the print quantities and dates of Pearson's publications, including the print quantity report.

    A.    <u>Non-public financial information, sales and marketing projections, and forecasts</u>

We address the first two categories of information together because, in our view, they are analytically similar. To show good cause for a protective order encompassing Pearson's non-public financial information, sales and marketing projections, and forecasts, Pearson relies on the declarations of William E. Hess, Senior Vice President and CFO of Pearson School Group, and John Owen, Senior Vice President and CFO of Pearson's Higher Education Group. Regarding

non-public financial information, Hess avers:

> Pearson's non-public financial information . . . would be very valuable to competitors because it would reveal Pearson's actual distribution quantities for the publications at issue; the revenues and expenses associated with production, marketing, and sale of those publications, including royalty expense data; and its profit margin for each publication. Per-publication distribution and profitability information is highly sensitive because it reveals Pearson's sales strategies, profit trends, and market penetration in particular segments of the market . . . This non-public financial information thus reveals Pearson's interest in growing market share for a particular textbook, course, or segment of the marketplace as well as its royalty agreements with particular authors. If such information were disclosed, Pearson's competitors would improperly gain insight into Pearson's competitive strategies, financial agreements with authors, and profitability for particular publications. Accordingly, disclosure of Pearson's non-public financial information would substantially undermine Pearson's ability to compete in the market.

(Hess Dec. ¶ 6).

Regarding Pearson's sales and marketing projections, Hess likewise contends:

> Pearson's sales and marketing projections and forecasts would be extremely valuable to competitors because such documents reveal Pearson's market research, financial feasibility assessments, and annual sales projections for the life of a publication. Before a proposed textbook is approved for publication, Pearson evaluates the curricular offerings of the proposed publication vis-a-vis existing educational alternatives, the opportunity to publish related ancillary products like state-specific editions, and the financial feasibility of the proposed publication. In doing so, Pearson projects publication and sales information for the life of a textbook program. These projections include estimated unit sales over time; production, editorial, edition, and royalty cost estimates; and estimated pricing levels and break-even targets. As a result, documents reflecting Pearson's pre-publication sales and marketing forecasts reveal Pearson's market research, financial feasibility analysis, and sales strategies by showing how many copies of a particular textbook Pearson expected to sell and where Pearson intends to sell them. They also reveal Pearson's assessment of curricular alternatives and interest in growing its market share for a particular textbook, course, or segment of the marketplace, thereby providing its competitors with a roadmap to compete more effectively with Pearson. Further, disclosure of Pearson's sales and marketing forecasts would enable Pearson's competitors to understand and leverage Pearson's non-public royalty agreements with specific authors. Disclosure of Pearson's sales and marketing projections and forecasts would

therefore substantially undermine Pearson's ability to compete in the market. (Hess Dec. ¶ 7).

In his declaration, Owen makes similar assertions regarding the commercially sensitive nature of Pearson's non-public financial information, sales and marketing projections, and forecasts. (Owen Dec. ¶¶ 6-7).

Hess and Owen also detail the measures Pearson took to ensure that such financial information, sales and marketing projections, and forecasts remain confidential. According to Hess and Owen, Pearson restricts access to non-public financial data and sales and marketing forecasts to "personnel who have a business need for the information." (Hess Dec. ¶ 8; Owen Dec. ¶ 8). Further, Pearson "requires its employees to sign non-disclosure agreements as part of the hiring process." (Id.). Finally, Pearson at least sometimes executes confidentiality or non-disclosure agreements regarding such information with third-parties such as authors, printers, and other vendors. (Id. ¶ 9).

In response, GHPI argues that Pearson's self-serving declarations fail to establish that Pearson would suffer a clearly defined and serious injury if the aforementioned non-public information came to light, primarily because (1) the Hess and Owen declarations are vague and conclusory, and (2) much of the information is old and therefore less relevant to the current marketplace.

Pearson gets the best of this argument. As noted *supra*, we must balance public and private interests in deciding whether to issue a protective order. Glenmede, 56 F.3d at 483. Here, the Hess and Owen declarations convince us that Pearson has a strong interest in keeping its non-public financial information, sales and marketing projections, and forecasts confidential.

In particular, the declarations give relatively specific examples of how disclosure of such information would significantly impair Pearson's competitiveness in the market. In fact, we believe this kind of information would unfairly afford Pearson's competitors *direct* insight into Pearson's inner-workings.

For example, suppose a competitor gained access to documents reflecting Pearson's revenues and costs. By comparing Pearson's revenues and costs to its own, Pearson's competitor would know in which areas or segments of the market Pearson operates most profitably and efficiently. Using that information, the adversary could adjust its business practices accordingly to compete more effectively against Pearson. One enjoys a big advantage by knowing the strengths and weaknesses of one's opponent.

As another example, consider what would happen if a Pearson competitor obtained a copy of Pearson's sales and marketing projections for the upcoming year. The competitor could utilize that information to "scoop" Pearson in the markets Pearson intends to target, without spending any of its own money to conduct the research that Pearson already did. Or Pearson's competitor could refine its own sales strategy based on insight gleaned from Pearson's market predictions. Possibilities of harm to Pearson abound.

On the other hand, we do not believe the public can claim any strong "right to know" a company's private financial data and market analysis. Although some of the information Pearson seeks to protect may be old (and therefore less commercially sensitive), the public interest in accessing such information likewise wanes over time. Therefore, with respect to these two categories of information (financial data, and sales and marketing projections and forecasts), Pearson's private interest in confidentiality dwarfs the public's interest in disclosure.

9

GHPI can hardly claim surprise at this conclusion, as courts routinely find good cause to protect the confidentiality of the type of information at issue here. See, e.g., Jon Feingersh Photography, Inc. v. Pearson Educ., Inc., No. 11–5122, 2012 WL 957534, at *2-4 (E.D. Pa. Mar. 13, 2012) (Brody, J.) (granting Pearson's motion for protective order covering non-public financial data, as well as sales and marketing projections and forecasts, in analogous suit); Goldenberg v. Indel, Inc., No. 09–5202, 2012 WL 15909, at *3-4 (D.N.J. Jan. 3, 2012) (recognizing that "the confidentiality of business agreements, trade secrets or commercial information are a legitimate private interest and the disclosure of this information can be used for the improper purpose of causing harm to the litigant's competitive standing in the marketplace.") (citations omitted); Hershey Co. v. Promotion in Motion, Inc., No. 07–1601, 2010 WL 1812593, at *3 (D.N.J. May 4, 2010) (finding that public disclosure of "proprietary and commercially sensitive financial and sales information" "could compromise the ability of [a company] to remain competitive in the industry."); Sprinturf, Inc. v. Sw. Recreational Indus., Inc., 216 F.R.D. 320, 324 (E.D. Pa. 2003) (concluding that "past and future market share, the size of future markets, . . . and proprietary information regarding the development of . . . [a] product line" constitutes confidential commercial information, the disclosure of which could result in competitive disadvantage); Miles v. Boeing Co., 154 F.R.D. 112, 114-15 (E.D. Pa. 1994) (observing that "[t]he subject matter of confidential business information is broad, including a wide variety of business information. . . .[and] Competitive disadvantage is a type of harm cognizable under Rule 26.") (internal citation omitted).

B.     Print quantities and dates, including the print quantity report

We now turn to the heart of the parties' dispute, the print quantity report. We recognize

that courts have split over this issue. Compare Jon Feingersh Photography, 2012 WL 957534, at *1-2 (denying Pearson's motion for protective order covering print quantities and dates), with Bean v. Pearson Educ., Inc., CV 11–8030, 2011 WL 2559831, at *1-2 (D. Ariz. June 28, 2011) (granting Pearson's motion for protective order covering print quantities and dates, noting that the "[c]ourt can discern no countervailing public interest that outweighs Defendant's interest in maintaining the confidentiality of its print run numbers."). Considering the peculiar and troubling posture of this particular case, we better serve *both* public and private interests by granting Pearson's motion to protect its print quantity data.

First, we acknowledge that the public has a strong interest in the sharing of information among current and potential litigants. See Glenmede, 56 F.3d at 485. Relatedly, the Third Circuit has rightfully admonished that "[f]ederal courts should not provide a shield to potential claims by entering broad protective orders that prevent public disclosure of relevant information." Id. This matter presents just such a concern. According to GHPI, Pearson has committed widespread, intentional, and systemic copyright infringement in many of its textbooks by printing more copies of the books than Pearson's limited licenses permit. In addition, Pearson apparently refuses to voluntarily inform unsuspecting photographers (and the associated copyright holders) about these print overruns. For example, GHPI's complaint in this suit alleges that, when asked, Pearson would not give GHPI information about Pearson's unauthorized uses of GHPI's photographs. (Doc. No. 1 ¶¶ 23-29). Thus, "public disclosure of print run numbers and dates is highly relevant to other Pearson licensors because this information will likely aid them in determining if their copyrights have been infringed by Pearson." Jon Feingersh Photography, 2012 WL 957534, at *2. In other words, if we decline to protect Pearson's print

11

run report, we may benefit the public by giving putative claimants access to information regarding Pearson's potential violation of the claimants' intellectual property rights (valuable information that might not otherwise be available).

But we simply cannot condone, much less ratify, Plaintiff's gamesmanship in this matter. As noted *supra*, we first discussed Pearson's creation of the now-famous print quantity report at the Rule 16 conference in this case. At that point in time, Pearson had not yet generated the report, which apparently takes a great deal of effort to compile. The parties both represented to the Court that this report would greatly expedite resolution of the case by effectively eliminating many of the over-2,500 pending copyright infringement claims (thus laying the groundwork for productive settlement discussions based on a common set of facts). In addition, the parties agreed to keep the report "Attorney's Eyes Only" pending the entry of a protective order. While the parties did not expressly and definitively stipulate to such a protective order in our presence, Plaintiff's counsel certainly led (or at the very least, allowed) this Court to believe that Plaintiff had no problem keeping the report under wraps.

Relying on Plaintiff's tacit acceptance of the report's confidentiality, Pearson created the report and sent it to Plaintiff. Now, report in hand, Plaintiff has reversed course and refuses to consent to a protective order. Since Pearson does not object to Plaintiff's use of the report in *this* matter, we can logically assume that Plaintiff's counsel hopes to utilize this report in *future* litigation against Pearson. In other words, the *public* interest trumpeted by Plaintiff's counsel unquestionably mirrors counsel's own *private* interest. As discussed *supra*, the public does have an interest in seeing wrongdoing (by Pearson, or anyone else) come to light; we cannot fix what we cannot see. But the public also has an interest in encouraging parties to deal with the courts

(and each other) openly and honestly, so that disputes may be resolved justly and efficiently. Under the circumstances, this interest in candor before the courts outweighs the public interest in sharing Pearson's print run numbers with potential copyright infringement victims.

In addition, the public interest is only one side of the equation. We must also consider Pearson's private interest in the confidentiality of its print run information, including its print quantity report. GHPI contends that Pearson essentially forfeited any such interest by disclosing its print runs on occasion in the past. We do not find that argument persuasive. As Pearson correctly points out, the limited disclosure of certain print quantity information to several third-parties with whom Pearson has a relationship (including GHPI and other photographers) does not mean such information is publicly available, or that Pearson has no interest in maintaining its confidentiality, or that the print quantity information of all Pearson's publications is publicly available. The Hess and Owen declarations satisfy us that Pearson attempts to protect the confidentiality of its print quantity reports, even within Pearson. (Hess Dec. ¶¶ 8-9; Owen Dec. ¶¶ 8-9). Therefore, as a threshold matter, we find that Pearson's print quantity report and the undisclosed underlying data constitutes confidential commercial information subject to protection for good cause.

It goes without saying that Pearson's desire to avoid a barrage of copyright infringement suits by concealing the evidence of its (alleged) wrongdoing does not qualify as a legitimate private interest justifying entry of a protective order. However, Pearson insists that public disclosure of the print quantity report would impair Pearson's ability to compete, which *is* a legitimate interest. In particular, Pearson worries that the report will reveal Pearson's sales strategies, which competitors could use to compete more effectively against Pearson. (Hess Dec.

¶ 5; Owen Dec. ¶ 5). Maybe so, but Pearson's print run information reflects, at most, *indirect*, *secondary* evidence of Pearson's sales strategies. In other words, Pearson's competitors would have to make many inferences and educated guesses to divine Pearson's "sales strategies" from its prior print run numbers alone. The fact that Pearson printed, say, 80,000 copies of a particular textbook on a particular date does not say very much about Pearson's business approach, views on a particular market, and so forth. Therefore, although Pearson's print quantity report is commercially sensitive, it is not greatly so (in contrast to Pearson's financial data and market projections, which would give Pearson's competitors *direct, primary* information to leverage against Pearson in the marketplace).

In the end, both public and private interest considerations weigh in favor of granting Pearson's motion. Pearson does have a legally cognizable (albeit not particularly overwhelming) interest in keeping its print run data out of the hands of its rivals for competitive reasons. Additionally, while public disclosure of the print run report may help others vindicate their intellectual property rights, the public interest in litigants' candor and fair-dealing takes precedence in this case.[1]

III.     Conclusion

For the aforementioned reasons, Defendant Pearson Education's Motion for Leave to File a Reply Brief (Doc. No. 20) is GRANTED, and the associated Reply Brief (Doc. No. 20-1) has

---

[1] As should be evident, our conclusion regarding the propriety of a protective order covering Pearson's print run numbers is limited to the narrow circumstances of this case. We express no opinion on whether, as a general matter, courts should shield an alleged infringer's print run information from public eyes. Relatedly, if a member of the public seeking access to Pearson's print run report petitions this Court to lift or modify the protective order, we would conduct our analysis anew, re-balancing the public and private interests as to the particular individual requesting the report.

been considered.  Defendant's Motion for Protective Order (Doc. No. 18) is also GRANTED.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.